DIVISION OF CHILD PROTECTIVE SERVICES, Petitioner,

v.

Deborah C. DORAN * and Horace W. Cannon, III,* Respondents.

Family Court of Delaware, New Castle County.

Submitted: Feb. 17 and March 16, 1987. Decided: March 27, 1987.

---

* A fictitious name utilized to protect the anonymity of the parties.

Janice Tigani, of Dept. of Justice, Wilmington, for petitioner.

Stanley C. Lowicki, Wilmington, for respondents.

CONNER, Judge.

The above parties are before the Court on the petition of the Division of Child Protective Services (hereinafter referred to as DCPS or the Division) to terminate the parental rights of Deborah C. Doran (sometimes hereinafter referred to as "Mother") and Horace W. Cannon, III in their son, Adolph A. Cannon, born October 6, 1979. Horace W. Cannon has signed an affidavit consenting to the termination of his parental rights in his son, Adolph A. Cannon. Deborah C. Doran objects to the termination of her parental rights in Allen and requests that his custody be immediately returned to her.

The statutory grounds alleged by DCPS in their petition filed in this Court on June 17, 1986, are that Deborah C. Doran has failed to adequately plan for her son's physical, mental and emotional needs, health and development and that the conditions which led to the placement of Allen with that agency still persist with little likelihood that the conditions will be remedied at an early date. DCPS has the burden of proving by clear and convincing evidence that they have satisfied the above stated statutory requirements. (13 *Del.C.* § 1103(5)(a)).

The pertinent portions of the statute referred to above read as follows:

13 *Del.C.* § 1103(5)(a):

(5) The parent or parents of any child, or any person holding parental rights over such child, are not able, or have failed, to plan adequately for the child's physical needs or his mental and emotional health and development and:

(a) In the case of a child in the care of an authorized agency:

1. The child has been in the care of an authorized agency for 1 year, or there is a history of previous placement or placements of this child, or a history of neglect, abuse or lack of care of other children by his parent; and

2. The conditions which led to the placement still persist, and there appears to be little likelihood that those

conditions will be remedied at an early date so that the child can be returned to the parent in the near future.

As the petitioner alleging that termination of parental rights are justified, DCPS also has the burden of proving that it would be in the best interests of the child for the parental rights of his parents to be terminated. *Daber v. Division of Child Protective Services*, Del.Supr., 470 A.2d 723 (1983); *Kline v. Hartzler*, Del.Supr., 227 A.2d 210 (1967); *Patricia A.F. v. James R.F.*, Del.Supr., 451 A.2d 830 (1982).

In addition, the Court must be satisfied that DCPS has complied with the mandate of 29 *Del.C.* § 9003(11) which commands the Department of Services for Children, Youth and Their Families as follows:

> To establish, implement and follow procedures and standards compatible with due process of law with respect to the removal of a child from his home, a change in the placement of a child who is under the supervision of custody of the Department, and any other actions by the Department that may affect the legal rights of a child and his or her family.

This statute provides that the Division must comply with the basic principles of due process when removing a child from his home or changing his legal custody.

In a recent case, *In the Matter of Derek W. Burns, a Minor Child*, Del.Supr., 519 A.2d 638 (1986), the Supreme Court has charged this court with the responsibility of determining whether the Division has complied with the Child Welfare Act of 1980, 42 U.S.C. §§ 608, 620–28, 670–76 (1982). Specifically, the Court must review the reunification efforts made by the Division and must be satisfied that the Divison has put forth its best efforts to unify the family prior to petitioning for the termination of the parental rights of the parents.

The legal history of the case at hand causes great concern as to whether Deborah Doran was afforded her basic due process rights at a most important stage in the proceeding, the time when legal custody was removed from her and transferred to the Division of Child Protective Services. What transpired and what did not transpire by way of reunification efforts after the initial transfer of custody raise even more serious questions. There have been three placements of Allen. The first placement occurred in August of 1983 when Deborah and John Doran were married and living together. They approached DCPS and requested that Agency to assist them in obtaining money to have tubes placed in Allen's ears. There was an Order awarding temporary custody to D.C.P.S. entered by Judge Parrish on September 8, 1983, which Order was rescinded that same day. That Order involved Allen and his baby brother John L. Doran. The actual placement ended when the two boys were returned to Mr. and Mrs. Doran on November 3, 1983.

Allen and John L. were placed in foster care for a second time on December 27, 1983. This placement was also requested by Deborah Doran and was unquestionably voluntary. At that time the Doran home was without heat and water and Deborah Doran and her husband were fighting and drinking heavily. The children remained in DCPS placement until November of 1984 when they were returned to their mother who had separated from her husband. From a legal standpoint, no steps were taken until March 8, 1984, when Deborah Doran, pursuant to the request of Patricia Lee, the DCPS worker assigned to the case, signed a consent to transfer legal custody of Allen and John L. to that agency. Deborah Doran was not represented at the time. Her signature was witnessed solely by Patricia Lee, the DCPS case worker. This consent document provided in pertinent part:

> "I understand a hearing will be held at the Family Court, 900 King Street, Wilmington, Delaware, on April 2, 1984, at 9:00 a.m., at which time I may appear represented by an attorney. This hearing will be for the purpose of allowing the Division of Child Protective Services to present their petition for custody of my children to the Court and for the Court to explain to me my rights and responsibilities."

The only Court document relating to the removal of the Cannon boys from their

mother's custody is a Petition and Order signed by a Family Court Master on April 4, 1984. The Order portion of the document states:

"the foregoing petition having been read and considered: It is the Order that custody of Adolph A. Cannon, born 10/6/79, be granted to the Division of Child Protective Services".

The Master's Order does not advise the parties that they had a right to a Review de Novo of this Order within fifteen days. Mrs. Doran did not appear before any Master.

Notwithstanding the possible invalidity of this Order, Mrs. Doran was in agreement for DCPS to place Allen and Johnnie L. in a foster home and along with Mr. Doran entered into a service plan agreement to be completed within six months. In April of 1984, Allen was evaluated by Dwight Jones, Ph.D., the staff psychiatrist at the Terry Center. Dr. Jones diagnosed Allen as having an adjustment disorder but did not recommend in-patient therapy. This second placement concluded on November 2, 1984, when both boys were returned to their mother's home. According to Mrs. Lee, weekend visits had been going well and mother had a nice clean apartment in Alban Park where Allen could continued to attend Richardson Park Intensive Learning Center.

The third and final placement commenced on February 1, 1985, when Allen was voluntarily admitted by his mother to the Terry Center for in-residence care. He had been diagnosed by Dr. Jones in January as having an "attention deficit disorder with hyperactivity". From a legal standpoint, there was no additional Family Court Order transferring Allen's custody from his mother. Ms. Lee persuaded mother to sign another service plan agreement as if DCPS retained custody.

Prior to his admission to the Terry Center, Allen had been receiving counseling as an out-patient as his behavior had deteriorated since returning home in November. It included leaving the house in the middle of the night while his mother was sleeping, setting fires, and inappropriate bathroom habits. The duration of the in-residence program at Terry Center was for three months. During this three month period, mother visited Allen, tried some home visits and continued to counsel with Linda Campbell, the nurse therapist in charge of Allen's therapy. Ms. Campbell suggested a "time-out" punishment technique which involved placing Allen in isolation.

At the end of Allen's three month stay at the Terry Center, all concerned, including mother, agreed that Allen was not ready to return home. Mother did not feel that she could cope with his behavior at this point in time. Arrangements were made for Allen to be transferred to the care of the Catholic Social Services which placed him in their group home at Sienna Hall. On April 25, 1985, Allen moved to Sienna Hall. The plan was for Allen to remain at Sienna Hall for ninety days, have home visits and return home in September. The staff of Catholic Social Services were forced to move Allen in May to a second group home at Seton Villa due to his disruptive behavior at Sienna Hall. This behavior included riding his big wheel into the street without looking and again evidencing a preoccupation for fires. He frequently played with fire extinguishers and on one occasion, he burned paper with a heated light bulb. On another occasion, he chewed through a telephone cord.

In June, mother moved and lost her driver's license. This hindered her visitation and she suggested that Allen's father resume visitations to determine whether he could handle him better than she. Also in June 1985, Allen was moved to the home of a host family, the Robinson's, where he stayed from Monday through Friday. For approximately two months, he returned to Seton Villa on the weekends. In August, Allen moved fulltime to the Robinson's home and he has lived in this foster home since that time.

Returning to activities of Ms. Doran, she ceased attending counseling sessions with Ms. Campbell in June after counseling throughout the Spring of 1985. In July, mother made a decision to move to Tampa,

Florida and, according to her testimony, she asked Ms. Lee to return Allen to her so that he could accompany his mother and brother to Florida. Ms. Lee denies that Ms. Doran made this request prior to moving to Florida, but acknowledges that Ms. Doran requested that Allen be sent to her after she became settled. Ms. Lee testified that she felt it necessary to follow the guidelines of an inter-state compact so that the appropriate Florida agency could become involved in the case.

In September, Ms. Doran moved back to Delaware and on September 9th asked DCPS to return custody of Allen to her. DCPS declined as they were working on the new objective to returning Allen to his father's custody. Ms. Lee reported that DCPS had some hope that Mr. Cannon would be able to raise Allen. In October 1985, the subject of termination of parental rights was discussed by Pat Lee, Linda Campbell, and Marilyn Cockrell of Catholic Social Services. A second meeting concerning termination was held in January 1986 and at that time a firm decision was made by DCPS to petition this Court to terminate the parental rights of Allen's parents. Gertrude Halpern, the Family Service of Delaware counselor who had been working with Allen's mother, dissented against this decision.

Against this factual background, I am required to apply the applicable legal requirements for termination of the parental rights of Allen's parents. After reviewing those necessary legal standards in light of the evidence received, I am not satisfied that any of the requirements for the termination of the parental rights of Deborah Doran have been met in this case. I shall discuss each requirement separately.

### DUE PROCESS

■ In July of 1985, upon moving to Florida, and again in September, upon returning to Delaware, Deborah Doran requested DCPS to return the physical care and custody of Allen to her. DCPS refused, but had no legal basis to do so other than the Master's Order of April 4, 1984. Counsel for DCPS contends that this Order awarding custody to DCPS was a valid one at the time it was entered and that it remained in effect even after physical custody of Allen had been returned by DCPS to mother in November of 1984. Assuming arguendo that the Order remained in effect after the return of physical custody, I must determine whether Deborah Doran was afforded the minimum requirements of due process at the time the Order was entered. Mother was unrepresented in April of 1984 and had faith and trust in Patricia Lee of DCPS who had helped her with her children and with her domestic problems. The only written notice referring to a hearing in Family Court was the consent to placement form which indicated that a hearing would take place on April 2, 1984. However, no petition for custody had even been filed by April 2nd. On April 4th, without any prior notice of a Court hearing mother accompanied Ms. Lee, to Family Court. Ms. Lee prepared a petition on a form supplied by the Court and that same day it was presented to a Master. The procedure followed in this case was highly irregular in that: (1) the petition was prepared by the DCPS case worker and not by their attorney; (2) it was presented to a Master and not a Judge; (3) it was presented the same day it was filed without an emergency affidavit; and (4) no adjudicatory hearing was ever held. The Court Order removing custody of her two boys from Deborah was entered by a Master in his office based solely upon the facts alleged in a petition. Ms. Doran obviously did not realize that she had a right to a Court hearing before a Court Order was entered or that she had a right to a Review de Novo of a Master's finding. Family Court Masters have authority to make recommendations and findings. These findings can only evolve into a Court Order after the time for a Review de Novo has elapsed. (10 *Del.C.* § 913(c)). The Order itself contains no language advising Ms. Doran of her right to a Review de Novo before a Judge. There is no question that Deborah Doran was denied minimum due process by this quasi-judicial procedure. The procedure followed was clearly in violation of Family Court Rules 482 and 483 which govern dependency—neglect

cases. This relinquishment of the legal custody of her child through this improper procedure later prevented her from insisting upon the return to her of her son when she planned to move to Florida and upon her return therefrom and provided DCPS with a legal crutch to deny these requests. The lack of due process at the time legal custody of Allen was removed from his mother emasculates the entire proceedings following the request of Deborah Doran to have the physical custody of her son returned to her.

## REUNIFICATION

■ Since July of 1985, there has been little or no effort by DCPS to reunite mother with her son. DCPS did explore reunification between Allen and his father for a brief few months. This attempt was commenced at mother's request in June of 1985, but DCPS should not have abandoned mother, the person who came to them for help in coping with her son's behavior. In October 1985, DCPS turned their attention from reunification with either parent to termination of the parental rights of both. It must be kept in mind that it was only in February of 1985, when Deborah Doran voluntarily committed Allen to the Terry Center. The duration of that stay alone was scheduled for three months. Thereafter, all parties concerned with Allen agreed that it would be best for him to be placed in a group home situation and a second three months stay was arranged at Sienna Hall. DCPS abandoned any attempt to reunify Allen and his mother after July 1985, a mere five months from the date when Deborah Doran voluntarily relinquished physical custody of her son for his own benefit and before he completed his stay at the group home. In light of the voluntary admission of her son by Deborah Doran to the Terry Center for professional help and the very short time that elapsed thereafter, I cannot find that DCPS made a reasonable effort to reunify Allen with his mother before determining to proceed with the termination of her parental rights.

## STATUTORY GROUNDS

■ The State must prove by clear and convincing evidence that Deborah Doran failed to plan adequately for Allen's emotional health and development and that the conditions which led to his placement still persist with little likelihood that these conditions will be remedied at an early date. (13 *Del.C.* § 1103(5)a.2.) The condition which led to Allen's placement was his mother's inability to cope with his behavior. At the time, she admitted Allen to the Terry Center in February of 1985, Allen had never received any in-patient treatment and had been receiving out-patient therapy for less than one month. Mrs. Doran, herself, was in an unstable situation. She changed both her job and her residence in the spring of 1985. Allen is now seven years old, has had the benefit of in-residence psychotherapy and group home living, attends school, and is on a prescribed medication "Ritalin" which improves his concentration and curbs his hyperactivity. His mother has held a steady job since November of 1985 and has resided in the same two bedroom apartment in Newport for over one year. The conditions surrounding both Allen and his mother have changed drastically since the time of Allen's placement at the Terry Center. Allen's behavioral problems have been dealt with and progress made. Mother's lifestyle has become stable. According to Dr. Jones, children with Allen's type of disorder generally outgrow such disorders at puberty. Until that time, kids with "attention deficit disorders" need a maximum amount of structure at home and some medication to enable them to concentrate at school. The medication is available. Allen's mother has been instructed in what is required of her at home and her personal life is sufficiently stable to enable her to meet Allen's physical and emotional needs. She has proved to be a capable parent for her son Johnnie L.

## BEST INTERESTS

■ Finally, I am not satisfied that it is in Allen's best interests for his mother's parental rights to be terminated and for him to be adopted. Adoption would have

the effect of separating Allen from his brother only two years younger. This could have a long term negative effect on both boys. Separation of siblings close in age and of the same sex is generally not in the best interest of either child. It is true that Allen has been dependent upon persons other than his mother for his essential needs for over two years. He has been in his present foster home for almost eighteen months and apparently he is well adjusted there. With the aid of the medication "Ritalin", Allen has adjusted to his school. However, mother has faithfully maintained her contact with her son and visited him as much as she was permitted by DCPS. It must be remembered that Allen was raised primarily by his mother during the very important early bonding years of his life.

Due to his past relationship with his mother and the presence of his younger brother, I am unable to say that it would be in Allen's best interests for him to move permanently to an adoptive family.

In summary, the failure to render Deborah Doran minimum due process renders invalid the removal of her son's custody from her. Failure of the Division to use reasonable and extended efforts to reunify mother and son after a voluntary placement by that mother estops them from pursuing the termination of her parental rights at this point. More importantly, significant changes in circumstances indicate that the conditions that led to Allen's placement in February of 1985, no longer persist and it is in Allen's best interest for him to be reunited with his mother and younger brother.

The petition to terminate the parental rights of Deborah Doran in her son, Adolph A. Cannon, born October 6, 1979, is denied. The Court declines at this time to terminate the parental rights of Horace W. Cannon, III, in his son since the effect of such termination would be to leave only one parent holding parental rights and the Court does not find that the continuance of the parental rights in Horace W. Cannon, III will be harmful to Allen.

Physical custody of Allen is to be returned to Deborah Doran on the weekend following the end of the present school year. Until that time Allen shall spend each weekend with his mother from Friday evening at 5:30 p.m. until Sunday evening at 7:00 p.m. The Court sincerely thanks Mr. and Mrs. Robinson for their important contribution to Allen's life.

IT IS SO ORDERED.